NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

EVARISTO RODRIGUEZ and JULIO
BECCERRIL,

        Plaintiffs,

v.

SPARTAN CONCRETE PRODUCTS,
LLC,

        Defendant.

Civ. No. 12-29

**OPINION**

THOMPSON, U.S.D.J.[1]

### INTRODUCTION

This matter comes before the Court upon the Complaint filed by Plaintiffs Julio Beccerril

and Evaristo Rodriguez (collectively, "Plaintiffs") seeking damages against Defendant Spartan

Concrete Products, LLC ("Defendant") for allegedly unpaid overtime work and wrongful

discharge. The parties proceeded to trial to determine whether Defendant owes Plaintiffs any

unpaid overtime wages pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201

*et seq.* (Count I) or the Virgin Islands Fair Wage and Hours Act (the "VIFWHA"), 24 V.I.C. § 1

*et seq.* (Count II); whether Defendant wrongfully discharged Plaintiffs pursuant to the Virgin

Islands Wrongful Discharge Act (the "VIWDA"), 24 V.I.C. § 76 (Count III); and (3) whether

Defendant breached the implied covenant of good faith and fair dealing (Count V). (*See

generally* Compl. ¶¶ 17–25, 29–31, ECF No. 1; 2d Am. Joint Proposed Pretrial Order at 1, ECF

---

[1] The Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

No. 156.) The Court conducted a non-jury trial on November 13 and 14, 2018 and considered all evidence presented.[2] (ECF Nos. 167, 173.) Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Defendant, formed in 2006, is a limited liability company located in the Virgin Islands. Defendant makes, sells, and delivers ready-mix concrete on both St. Croix and St. Thomas. During the relevant period, Rodger Bressi served as general manager, James McCoy served as operations manager, Halvor Berg served as a dispatcher for assignments, Denroy Adams served as a mechanic, and Eugenie Williams served as the office manager performing HR-related tasks. Dion Alibocas served as the general manager, after Mr. Bressi, from 2012 until 2015.

Defendant employed both concrete truck drivers who transported concrete and dump truck drivers who transported various materials such as sand and gravel. Defendant differentiated between the two positions: it considered concrete truck drivers to be "employees" and dump truck drivers to be "independent contractors." (McCoy Dep. 13:16–22, Def.'s Ex. 22.) Concrete truck drivers punched in and punched out of work each day, recorded their hours directly into an employee timesheet system (*see, e.g.*, Def.'s Ex. 16), and were paid by the hour at all times (Bressi Dep. 19:1–4, Def.'s Ex. 21). Dump truck drivers, in comparison, did not have written employment contracts (H. Berg Dep. 14:24, 15:1–2, Def.'s Ex. 29) and were mostly paid by the delivery rather than by the hour (Bressi Dep. 4–15). Defendant contended at trial that dump truck drivers were not needed every day and did not need special training or qualifications, as opposed to the concrete truck drivers who needed extensive training and a

---

[2] On January 7, 2015, Plaintiff Rodriguez suffered a stroke, which rendered him unable to work. Although Plaintiff Rodriguez testified at trial, this stroke created some challenges and at times affected his ability to recall the events in dispute.

2

working knowledge of concrete.

Defendant hired Plaintiffs to work as dump truck drivers. Plaintiff Beccerril began working for Defendant on January 22, 2010, and Plaintiff Rodriguez began working for Defendant around November 20, 2010. In order to obtain the position, Plaintiffs traveled to Defendant's facility and submitted applications with Defendant. Upon hiring, Defendant provided for each Plaintiff a hard hat, gloves, mandatory t-shirt with Defendant's insignia on it, dump truck with Defendant's insignia on it, tools as needed, safety manual, and employee manual. Plaintiffs were required to wear steel-toe boots, which Plaintiffs themselves had to obtain.

Plaintiffs were given their driving assignments by Mr. Berg or Mr. McCoy, and Plaintiffs were paid $22.50 for each delivery of materials.[3] Each delivery took about one and a half hours. On days where Defendant's dump trucks were unavailable and Plaintiffs could not deliver materials, Plaintiffs worked at Defendant's facility, performing miscellaneous tasks, such as repairing Defendant's vehicles or cleaning Defendant's property, and earning $14.00 per hour. Defendant paid Plaintiffs each week with a check that had Defendant's name on it.[4]

In order to keep track of the work performed on its behalf, Defendant maintained a "ticket system." Each dump truck delivery resulted in the creation of a "ticket" that included the date, unique ticket number, truck number, driver, customer who requested the delivery, type of

[3] On a typical day, Plaintiffs picked up sand, gravel, or stone from a quarry operated by Aggregate, Inc. and delivered it to Defendant's yard. However, Plaintiffs effected deliveries to and from other locations as well.

[4] Defendant submits that Defendant and Aggregate, Inc. had a "symbiotic" relationship in which Defendant's dump truck drivers would haul gravel for Aggregate, Inc., but Defendant—not Aggregate, Inc.—"would pay [Plaintiffs] because [Defendant] always owed money to Aggregate, Inc. and the money Aggregate, Inc. would have owed the drivers was offset by the bookkeepers." (Def.'s Proposed Findings of Fact & Conclusions of Law ¶¶ 57–61, ECF No. 175.)

3

product, amount of product, and price of product; the driver signed and submitted to Defendant each ticket at the end of each day. (*See, e.g.*, Def.'s Exs. 10–11; Pls.' Exs. 6–11.) When the dump truck drivers were not driving, all work performed at Defendant's facility had a corresponding ticket number with a description of the work and the amount of hours expended on that task.

Defendant did not deduct any taxes from Plaintiffs' paychecks as each Plaintiff signed a W-9 tax form indicating that they were independent contractors. Although Plaintiff Beccerril knowingly signed this form, Plaintiff Beccerril testified that he did not know what a W-9 tax form was at the time and signed it simply because "every job gives you a tax form paper" and Defendant asked him to sign it. At the end of 2010 and 2011, Defendant prepared and gave to Plaintiffs an IRS Form 1099 that indicated Plaintiffs' sole proprietor status, although both Plaintiffs testified that neither of them understood the significance of the 1099 tax forms. Neither Plaintiff Beccerril nor Plaintiff Rodriguez complained at the time that taxes were not being deducted from their paychecks. (*See* Bressi Dep. 44:21–24; Williams Dep. 47:18–25, Def.'s Ex. 25; Adams Dep. 12:1–4, Def.'s Ex. 28; H. Berg Dep. 47:5–14.)

On or around June 3, 2011, Defendant terminated Plaintiffs. Plaintiff Beccerril testified that Mr. Berg approached him and told him that Mr. Bressi received a complaint that Plaintiff Beccerril was speeding—though Mr. Adams testified that this conversation occurred "way before" (about "a year before") Plaintiffs were actually terminated (Adams Dep. 23:25–25:13). Apparently, someone saw Plaintiff Beccerril and another employee speeding in Defendant's dump trucks and informed Mr. Bressi; Mr. Bressi was "too busy to talk" that day, so he sent Mr. Berg to tell Plaintiff Beccerril that Defendant did not want him driving for Defendant anymore. Plaintiff Beccerril testified that he had not sped in Defendant's dump truck and had not received

4

a complaint about speeding heretofore. Mr. Berg handed Plaintiff Beccerril a termination letter

dated June 3, 2011:

> Due to economic difficulties and high overhead costs the management of
> [Defendant] has made the difficult decision of beginning to reduce its workforce
> and subcontractor services. It is with great regret that we informed you we have
> no other alternative but to terminate your services effective today June 3, 2011.

> Should we require your services in the future, we would be more than happy to
> contact you and offer you the opportunity to once again provide your services to
> [Defendant].

(Beccerril Termination Letter at 1, Pls.' Ex. 1.) Plaintiff Rodriguez received an identical letter,

which was also dated June 3, 2011. (*See* Rodriguez Termination Letter at 1, Pls.' Ex. 2.)

Neither letter mentions anything about speeding.[5]

The parties dispute the basis for the termination. Plaintiffs contend that Defendant's

proffered reason for termination—economic hardship—is inaccurate. Plaintiff Beccerril testified

that the work flow at the time of termination was "very busy"; for instance, he worked until

10:00 PM the night before his termination. Suspicious of Defendant, Plaintiff Beccerril traveled

to Aggregate, Inc. the day after his termination and saw an individual driving the same dump

truck belonging to Defendant that Plaintiff Beccerril had driven the day before; Plaintiff

Beccerril took photos of this individual. (*See* Pls.' Ex. 3.) Plaintiffs contend that this event

buttresses their position that Defendant cannot justify the terminations due to economic hardship.

Defendant, on the other hand, maintains that Defendant was forced to terminate Plaintiffs

because Defendant was experiencing economic hardship. Defendant first contends that its

production was slow, so "there's not enough work for everyday use" of the dump trucks. (H.

---

[5] After Plaintiff Beccerril's termination, he sought employment at "three to four" different
places, but he had to rely on little "side" jobs: working as a mechanic, cutting grass, and washing
cars. He was eventually hired by High Quality Concrete on April 7, 2017. After Plaintiff
Rodriguez's termination, he was unemployed until Ranger American hired him on May 9, 2013.

5

Berg. Dep. 22:7–24:2.) Michael Pede, who has a background in finance and began working for Defendant in early 2011, testified that budget cuts were necessary to save the company and that the termination of dump truck drivers made sense because they were not working every day. Mr. McCoy testified that "[b]usiness was slow" and that Defendant simply "had too many employees." (McCoy Dep. 24:12–14; *accord* Williams Dep. 32:3–8 (testifying that "[f]inances were very scarce and . . . the management had made the decision to begin to reduce the workforce"); Adams Dep. 21:24–22:9 (testifying that "things [were] slow and they're going to do a little cutback" around the time that Plaintiffs were terminated).) Mr. McCoy explained that Defendant terminated the dump truck drivers—but not the concrete truck drivers—because driving a concrete truck required more skill and knowledge, so the concrete truck drivers were capable of driving the dump trucks, but the inverse was not true. (McCoy Dep. 23:23–24:6 ("I felt that the concrete drivers could serve dual purposes and drive the concrete trucks or the dump trucks, whereas the dump truck drivers could not drive . . . the concrete trucks.").)

Defendant also contends that it was losing money "hand over fist" (Bressi Dep. 42:22–23) and was struggling to pay its bills (Williams Dep. 43:11–19). Defendant's Annual Report, which was submitted to the Office of the Lieutenant Governor of the Virgin Islands pursuant to 13 V.I.C. § 1211, depicts that Defendant had a "net income loss" of $1,695,639.00 and a "negative" balance of $2,765,963.00 in 2010; in 2011, Defendant had a "net income loss" of $1,663,811.89. (Def.'s Ex. 7.) And Defendant contends that its financial condition only worsened after it terminated Plaintiffs. Defendant terminated other employees and sold its dump trucks sometime in 2011 or 2012; Defendant contracted its trucking needs to another company that achieved better economy of scale. Defendant eventually closed its St. Thomas branch on December 20, 2013 (McCoy Dep. 10:13–16, 11:5–12:5), and closed its St. Croix branch

6

sometime in November of 2014.

The parties also dispute the number of hours that Plaintiffs worked each week. Plaintiff Beccerril testified that he worked eight regular hours (approximately 7:00 AM to 3:00 PM) and about four overtime hours each day for six days each week. Plaintiff Beccerril also estimated that he consistently worked twenty-four to twenty-five hours of overtime each week, noting that this schedule was "steady."[6] Plaintiff Rodriguez's position is the same.

Defendant's position, in contrast, is that Plaintiffs worked much less than the number of hours they claim. Ms. Williams testified, for example, that dump truck drivers were not needed every day and that Plaintiffs' work varied. (Williams Dep. 20:21–21:3 ("There were times when they would work long hours, or they would work an entire week, when there would be times that they would have no hours, or they would just work two days, three days.").)

Additionally, Mr. Alibocas testified about Defendant's ticket system for recording the dump truck drivers' hours. Mr. Alibocas examined all of Plaintiffs' known work tickets (*see, e.g.*, Def.'s Exs. 10–11) and compiled all of Plaintiffs' completed loads, hourly work, and corresponding wages into a summary chart ("Defendant's Spreadsheet") (*see* Def.'s Ex. 27). Defendant's Spreadsheet breaks down Plaintiffs' work completed by the week, but not by the day. (*Id.*) Defendant's Spreadsheet indicates that Defendant paid Plaintiff Beccerril \$22,110.32 in 2010 and \$6,413.08 in 2011; it also indicates that Defendant paid Plaintiff Rodriguez \$3,596.88 in 2010 and \$11,616.16 in 2011. (*See id.*) These figures vary only slightly from

---

[6] Plaintiff Beccerril's testimony that he worked eight regular hours and four overtime hours (twelve hours total) each day conflicts with his testimony that he worked twenty-four to twenty-five hours of overtime each week. If Plaintiff Beccerril were to work eight "regular" hours and four "overtime" hours each day for six days each week, *all* of his hours on the sixth day of the week would be considered "overtime" hours, computing to forty regular hours and thirty-two overtime hours (seventy-two hours total) each week.

7

Plaintiffs' 1099 tax forms, which indicate that Defendant paid Plaintiff Beccerril $21,230.30 in 2010 and $6,498.08 in 2011 (Def.'s Ex. 23; Pls.' Ex. 51), and that Defendant paid Plaintiff Rodriguez $3,569.88 in 2010 and $11,613.66 in 2011 (Def.'s Ex. 27; Pls.' Ex. 53). Mr. Alibocas testified that Defendant's Spreadsheet includes all of Plaintiffs' work tickets that he was able to find and that Defendant made no overtime (*i.e.*, increased rate) payments to Plaintiffs.

## CONCLUSIONS OF LAW

### I. Plaintiffs Were Employees, Not Independent Contractors

"There is no single test to determine whether a person is an employee or an independent contractor for purposes of the FLSA." *Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991). The FLSA defines the term "employee" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). But courts should look at the "circumstances of the whole activity" and examine "the economic realities of the [business] relationship." *Martin*, 949 F.2d at 1293. To do so, courts assess six factors:

1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 151 (3d Cir. 2015) (quoting *Martin*, 949 F.2d at 1293).

The *Martin* factors, taken together, demonstrate that Plaintiffs served Defendant as employees, not independent contractors. First, Defendant maintained the right to control the manner in which Plaintiffs performed their work. Defendant set Plaintiffs' hours, and Plaintiffs received all of their assignments from Mr. Berg and Mr. McCoy. Mr. Berg instructed Plaintiffs

8

on where and when to pick up materials and where to deliver those materials. Mr. Berg also assigned miscellaneous tasks for Plaintiffs to complete at Defendant's facility, for which they were paid on an hourly basis. The first *Martin* factor, therefore, favors Plaintiffs.

The second *Martin* factor also favors Plaintiffs. Although Plaintiffs were paid on a by-the-load basis for most of their work, Plaintiffs maintained no opportunity for profit or loss depending on their managerial skills. Defendant solicited and received delivery requests from their clients, and Plaintiffs simply heeded Defendant's instructions on when and where to satisfy these requests. Plaintiffs neither received nor even interacted with Defendant's clients, and Plaintiffs received no commission-like compensation for their efforts.

Third, Defendant provided most of the equipment that Plaintiffs needed to satisfy their job responsibilities. Defendant established a dress code and, in accordance with that premise, provided Plaintiffs with a hard hat, gloves, and t-shirt with Defendant's insignia on it. Plaintiffs' primary responsibility—driving a dump truck—was possible only because Defendant provided a dump truck, which had Defendant's insignia on it. When Plaintiffs performed their secondary responsibility—miscellaneous tasks at Defendant's facility such as repairing Defendant's vehicles or cleaning Defendant's property—Defendant provided all the tools and materials necessary to complete the tasks. The only equipment that Plaintiffs had to obtain themselves was a pair of steel-toe boots. The third *Martin* factor favors Plaintiffs as well.

Next, Defendant concedes that Plaintiffs' position did not require a special skill. Mr. McCoy testified that concrete truck drivers were capable of driving the dump trucks, but the inverse was not true of the dump truck drivers. (*See* McCoy Dep. 23:23–24:6.) In other words, concrete truck drivers needed no additional training to drive dump trucks. One may infer, therefore, that Plaintiffs' services were not an integral part of Defendant's business.

9

Accordingly, the fourth and sixth *Martin* factors favor Plaintiffs.

Finally, the fifth *Martin* factor favors neither party. It is undisputed that the parties did not execute a written employment contract. Although an oral employment contract existed, the specific terms vis-à-vis the degree of permanence of the working relationship are unknown. Additionally, although Plaintiff Beccerril signed a W-9 tax form indicating that he was a sole proprietor, Plaintiff Beccerril testified that he did not know what a W-9 tax form was at the time and signed it only because Defendant asked him to sign it and "every job gives you a tax form paper." All told, the *Martin* factors support the conclusion that Plaintiffs were employees of Defendant. Although Defendant labeled Plaintiffs as independent contractors and requested that Plaintiffs sign documents indicating the same, Defendant essentially treated Plaintiffs like employees.

## II. Plaintiffs Were Improperly Compensated

Plaintiffs seek damages pursuant to both the FLSA and the VIFWHA. Plaintiffs claim that they engaged in workweeks that exceeded forty hours for which they were not paid an overtime rate in violation of the FLSA. Plaintiffs also claim that they engaged in workdays that exceeded eight hours for which they were not paid an overtime rate in violation of the VIFWHA.

### A. *Fair Labor Standards Act*

The FLSA generally requires employers to pay their employees overtime rates for work performed in excess of forty hours in a single workweek. 29 U.S.C. § 207(a)(1); *see also Rosano v. Twp. of Teaneck*, 754 F.3d 177, 185 (3d Cir. 2014). An overtime rate is defined as a rate not less than one and one-half times the regular rate at which the employee is employed. § 207(a)(1).

"An employee bringing suit for unpaid overtime compensation bears the burden of

10

proving that he or she was not properly compensated for work performed on behalf of an employer." *Crisostomo v. Exclusive Detailing, Inc.*, 2010 U.S. Dist. LEXIS 64022, at \*8–10 (D.N.J. June 28, 2010); *see also Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984). The FLSA requires employers to preserve records of the "wages, hours, and other conditions and practices" of its employees, § 211(c), which includes hours worked each day, total hours worked each week, total daily or weekly straight-time earnings, and total premium pay for overtime hours, 29 C.F.R. § 516.2(a). These records, unearthed in discovery, typically aid a plaintiff's case-in-chief. If an employer's records are unclear, however, "an employee satisfies the burden of proof if he or she produces enough evidence to permit a court to make a 'fair and reasonable' inference that the employee performed work for which he or she received improper compensation." *Crisostomo*, 2010 U.S. Dist. LEXIS 64022, at \*9–10. If the plaintiff clears this hurdle, "the burden shifts to the employer, who must provide evidence that sets forth the 'precise amount of work performed' or that otherwise 'negatives the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)); *see also* Martin, 949 F.2d at 1297.

To determine whether Plaintiffs are owed unpaid overtime work, the Court must first determine the number of hours that Plaintiffs worked each week. Defendant's own trial exhibit—Defendant's Spreadsheet, about which Mr. Alibocas testified—provides an accurate summary of the work that Plaintiffs completed each week. Plaintiff Beccerril testified that he worked twenty-four to twenty-five hours of overtime each week, and Plaintiff Rodriguez testified to much of the same, but Plaintiffs' testimony lacks precision as it does not account for sick days, vacation days, and slower weeks where Plaintiffs would have been unlikely to work more than forty hours. Also, Plaintiff Beccerril provided somewhat inconsistent testimony

11

concerning the number of hours he worked each week. (*See supra* note 6 and accompanying text.) Defendant's Spreadsheet, in contrast, provides a week-by-week breakdown and demonstrates that although Plaintiffs engaged in some workweeks that exceeded forty hours, those workweeks occurred sporadically and, even when they did occur, they did not consistently add up to twenty-four to twenty-five overtime hours. As a result, Defendant's Spreadsheet provides a more accurate account of the hours that Plaintiffs worked for Defendant.

Although Defendant's Spreadsheet provides an accurate depiction of the *work* Plaintiffs completed, it fails to provide the *hours* that Plaintiffs completed. Defendant's Spreadsheet breaks down each paycheck by the week, not by the day, and provides the amount of work completed and the amount of money paid each week. But Plaintiffs' earnings were mostly calculated "by the load"—which the rates themselves varied—not by the hour. By the face of Defendant's Spreadsheet, it does not reveal how many hours Plaintiffs worked each week. The Court reproduces three weeks as depicted on Defendant's Spreadsheet to provide an example:

| Week | Memo | Paid |
|------|------|------|
| 01/24/2010 | 14 loads @ $22.50 per load for Aggregate, 7 hrs @ $14.00 per hour for Aggregate, and 1 hr @ $14.00 per hour for Spartan | $427.00 |
| 03/06/2010 | 36 loads @ $22.50 per load for Aggregate, 20 loads @ $10.00 per load for Barge, and 2 hrs @ $14.00 per hour to clean dock | $950.50 |
| 11/20/2010 | 14 loads @ $22.50 per load for Aggregate, 2 loads @ $21.00 per load for Aggregate to Tip-Top, 1 load @ $45 per load to Sierre Verde, 24 loads @ $22.50 per load for Home Depot, and 1 load @ $22.50 per load for NAWS | $1,062.24 |

Because Defendant's Spreadsheet is lacking any aggregate of the hours that Plaintiffs actually worked, the Court itself must make that calculation. Plaintiff Beccerril testified that each load to Aggregate, Inc., for which Plaintiffs were paid $22.50, took about one and a half hours to complete. Defendant seems to agree, conceding in its Proposed Findings of Fact and Conclusions of Law that "[t]he evidence showed that Plaintiffs were paid $22.50 per load from

Aggregate, Inc. to [Defendant], and that the trip took 1.5 hours round trip, resulting in an equivalent hourly wage of $15 per hour." (Def.'s Proposed Findings of Fact & Conclusions of Law ¶ 14.) Therefore, the "evidence support[s] a reasonable inference" that Plaintiffs expended one and a half hours to complete each load inscribed on Defendant's Spreadsheet for which Plaintiffs were paid $22.50 per load. *See Tri-County Growers*, 747 F.2d at 128.

However, Plaintiffs were paid other by-the-load rates. For instance, Defendant's Spreadsheet shows that Plaintiffs were paid anywhere from $10.00 per load up to $45.00 per load. Neither party presented any evidence regarding how long it took to complete each load to earn these varying pay-per-load rates. Plaintiff Beccerril testified that offloading "the barge"—an assignment that paid $10.00 per load—took about four or five hours and that he commonly worked until 10:00 PM without even breaking for lunch; Plaintiff Rodriguez testified that he sometimes worked until 1:00 AM when offloading the barge. Because Defendant's Spreadsheet does not help to elucidate the number of hours expended while offloading the barge and the FLSA requires Defendant to preserve records of the hours Plaintiffs worked each day, 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a), the Court estimates the number of hours against Defendant. The $22.50 per-load rate is the most common rate on Defendant's Spreadsheet, and the above evidence supports a reasonable inference that all loads took about one and a half hours to complete. The Court therefore construes for calculation purposes that all loads—whether Plaintiffs were paid $45.00 per load, $22.50 per load, $21.00 per load, $15.00 per load, or $10.00 per load—took about one and a half hours to complete.

The Court next determines the appropriate overtime rate. Although Plaintiffs were paid varying by-the-load rates and the Court is unable to determine which assignments Plaintiffs completed before and after they reached the forty-hour mark for the week, the FLSA provides

13

some assistance. "It is settled doctrine that the FLSA is 'remedial and humanitarian in purpose,' and should 'not be interpreted or applied in a narrow, grudging manner.'" *Townsend v. Mercy Hosp. of Pittsburgh*, 862 F.2d 1009, 1014 (3d Cir. 1988) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). Section 207(g)(2) provides that for an employee who "perform[s] two or more kinds of work for which different hourly or piece rates have been established," the employee's computed overtime rate should be "not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours." § 207(g)(2). "An hourly rate will be regarded as a bona fide rate for a particular kind of work it is equal to or greater than the applicable minimum rate therefor and if it is the rate actually paid for such work when performed during nonovertime hours." 29 C.F.R. § 778.419(b).

The appropriate base rate here is $15.00 per hour and the appropriate overtime rate is thus $22.50 per hour. It took about one and a half hours to complete each load that paid Plaintiffs $22.50, and Defendant admits that this notion "result[s] in an equivalent hourly wage of $15 per hour." (Def.'s Proposed Findings of Fact & Conclusions of Law ¶ 14.) Although Plaintiffs were sometimes paid less than $22.50 per load, Defendant applied this pay rate most frequently. Therefore, the $22.50 per-load rate—and thus the $15.00 per-hour rate—will be regarded as the "bona fide [base] rate" applied for calculating the appropriate overtime rate. Because $15.00 is the bona fide base rate, Defendant should have paid Plaintiffs $22.50 per hour for all work completed in excess of forty hours for the workweek.

In sum, the Court determines the total amount owed to Plaintiffs by (1) examining each week in Defendant's Spreadsheet, (2) multiplying the Total Loads Delivered for the week by the one and a half hours expended to complete each load, (3) adding those hours to the

14

Miscellaneous Work that Plaintiffs completed at an hourly rate to compute the Estimated Total Time Worked, (4) subtracting forty hours from that number to compute the Estimated OT Worked for the week, and (5) multiplying that number by $7.50[7] to compute the unpaid Amount Owed to Plaintiffs for each week. The Court's calculations are as follows (only those weeks where Plaintiffs exceeded forty hours are included):

| Plaintiff | Week | Total Loads Delivered (#) | Misc. Work (Hrs) | Estimated Total Time Worked (Hrs) | Estimated OT Worked (Hrs) | Amount Owed ($) |
|---|---|---|---|---|---|---|
| Beccerril | 03/06/2010 | 56 | 2.00 | 86.00 | 46.00 | 345.00 |
| Beccerril | 03/13/2010 | 27 | 0.00 | 40.50 | 0.50 | 3.75 |
| Beccerril | 03/27/2010 | 32 | 0.00 | 48.00 | 8.00 | 60.00 |
| Beccerril | 04/10/2010 | 24 | 9.25 | 45.25 | 5.25 | 39.38 |
| Beccerril | 04/17/2010 | 43 | 6.75 | 71.25 | 31.25 | 234.38 |
| Beccerril | 05/15/2010 | 26 | 4.00 | 43.00 | 3.00 | 22.50 |
| Beccerril | 07/10/2010 | 35 | 5.00 | 57.50 | 17.50 | 131.25 |
| Beccerril | 07/17/2010 | 29 | 0.00 | 43.50 | 3.50 | 26.25 |
| Beccerril | 08/21/2010 | 40 | 2.25 | 62.25 | 22.25 | 166.88 |
| Beccerril | 10/30/2010 | 36 | 4.09 | 58.09 | 18.09 | 135.68 |

---

[7] Although the appropriate overtime rate is $22.50 per hour, Defendant does not owe an additional $22.50 for each overtime hour worked. Plaintiffs do not allege that Defendant did not pay Plaintiffs for their overtime hours; rather, Plaintiffs allege that Defendant did not pay Plaintiffs an overtime rate for their overtime hours. Defendant therefore must pay for each overtime hour the difference between the applicable overtime rate ($22.50 per hour) and what Defendant actually paid Plaintiffs ($15.00 per hour), which computes to $7.50 per hour.

| | | | | | | |
|---|---|---|---|---|---|---|
| Beccerril | 11/20/2010 | 42 | 8.41 | 71.41 | 31.41 | 235.58 |
| Beccerril | 12/04/2010 | 52 | 4.28 | 82.28 | 42.28 | 317.10 |
| Beccerril | 12/18/2010 | 30 | 3.41 | 48.41 | 8.41 | 63.08 |
| Beccerril | 01/15/2011 | 31 | 7.63 | 54.13 | 10.13 | 75.98 |
| Beccerril | 01/29/2011 | 9 | 36.00 | 49.50 | 9.50 | 71.25 |
| Beccerril | 02/19/2011 | 24 | 5.06 | 41.06 | 1.06 | 7.95 |
| Beccerril | 03/26/2011 | 25 | 11.80 | 49.30 | 9.30 | 69.75 |
| Beccerril | | | | **Total Amount Owed** | | **$2,005.76** |
| Rodriguez | 11/20/2010 | 30 | 1.08 | 46.08 | 6.08 | 45.60 |
| Rodriguez | 12/04/2010 | 45 | 2.00 | 69.50 | 29.50 | 221.25 |
| Rodriguez | 12/11/2010 | 31 | 2.67 | 49.17 | 9.17 | 68.78 |
| Rodriguez | 12/18/2010 | 26 | 1.25 | 40.25 | 0.25 | 1.88 |
| Rodriguez | 01/15/2011 | 35 | 5.83 | 58.33 | 18.33 | 137.48 |
| Rodriguez | 01/29/2011 | 7 | 36.00 | 46.50 | 6.50 | 48.75 |
| Rodriguez | 02/05/2011 | 15 | 36.50 | 59.00 | 19.00 | 142.50 |
| Rodriguez | 02/12/2011 | 30 | 0.00 | 45.00 | 5.00 | 37.50 |
| Rodriguez | 02/19/2011 | 37 | 0.00 | 55.50 | 15.50 | 116.25 |
| Rodriguez | 03/05/2011 | 29 | 0.00 | 43.50 | 3.50 | 26.25 |
| Rodriguez | 03/12/2011 | 32 | 4.50 | 52.50 | 12.50 | 93.75 |
| Rodriguez | 03/19/2011 | 32 | 2.50 | 50.50 | 10.50 | 78.75 |
| Rodriguez | 03/26/2011 | 28 | 3.83 | 45.83 | 5.83 | 43.73 |
| Rodriguez | | | | **Total Amount Owed** | | **$1,062.47** |

In all, Defendant owes Plaintiff Beccerril $2,005.76 for the hours that he worked in excess of a

forty-hour workweek in violation of the FLSA, and Defendant owes Plaintiff Rodriguez
$1,062.47 for the same.

    B.    *Virgin Islands Fair Wage and Hours Act*

    Similar to the FLSA, the VIFWHA requires employers to pay their employees overtime
rates—similarly defined as a rate not less than one and one-half times the regular rate at which
he is employed—for work performed in excess of forty hours in a single workweek. 24 V.I.C. §
20. One stark difference, however, is that the VIFWHA also requires employers to pay overtime
rates for work performed in excess of eight hours in a single workday. *Id.*

    Defendant's Spreadsheet, however, does not provide a day-by-day breakdown of
Plaintiffs' work; it provides only a week-by-week breakdown. As a result, Defendant's
Spreadsheet, on which the Court relies in determining the number of overtime hours Plaintiffs
worked each week, lacks the functionality to determine the number of overtime hours Plaintiffs
worked each day. Mr. Alibocas, who testified about the veracity of Defendant's Spreadsheet,
reassured that he included every one of Plaintiffs' work tickets that he found, but when asked if
there were ever an instance where Plaintiffs worked more than eight hours in one day, Mr.
Alibocas responded that "there may have been."

    Only one exhibit moves this probability from the abstract to the concrete. Defendant's
Exhibits 12 and 13 provide a day-by-day breakdown of the hours that Plaintiffs worked.
Although Defendant's Exhibits 12 and 13 clearly demonstrate that Plaintiffs occasionally worked
more than eight hours in a single day, it unfortunately provides data for only eleven weeks:
March 20, 2011 to June 3, 2011. Again using a base rate of $15.00 per hour and an overtime rate
of $22.50 per hour, Defendant owes Plaintiff Beccerril $98.63 for the hours that he worked in
excess of an eight-hour day in violation of the VIFWHA for these eleven weeks, and Defendant

17

owes Plaintiff Rodriguez $58.13 for the same:

| Plaintiff | Date | Total Loads Delivered (#) | Misc. Work (Hrs) | Estimated Total Time Worked (Hrs) | Estimated OT Worked (Hrs) | Amount Owed ($) |
|---|---|---|---|---|---|---|
| Beccerril | 04/08/2011 | 5 | 7.50 | 15.00 | 7.00 | 52.50 |
| Beccerril | 04/09/2011 | 6 | 0.00 | 9.00 | 1.00 | 7.50 |
| Beccerril | 04/20/2011 | 5 | 1.75 | 9.25 | 1.25 | 9.38 |
| Beccerril | 05/11/2011 | 4 | 2.20 | 8.20 | 0.20 | 1.50 |
| Beccerril | 05/17/2011 | 5 | 1.10 | 8.60 | 0.60 | 4.50 |
| Beccerril | 05/18/2011 | 5 | 1.10 | 8.60 | 0.60 | 4.50 |
| Beccerril | 05/22/2011 | 5 | 2.00 | 9.50 | 1.50 | 11.25 |
| Beccerril | 06/02/2011 | 6 | 0.00 | 9.00 | 1.00 | 7.50 |
| Beccerril | | | | | Total Amount Owed | $98.63 |
| Rodriguez | 04/11/2011 | 6 | 0.00 | 9.00 | 1.00 | 7.50 |
| Rodriguez | 04/28/2011 | 4 | 4.25 | 10.25 | 2.25 | 16.88 |
| Rodriguez | 05/17/2011 | 5 | 1.00 | 8.50 | 0.50 | 3.75 |
| Rodriguez | 05/27/2011 | 2 | 6.50 | 9.50 | 1.50 | 11.25 |
| Rodriguez | 05/22/2011 | 5 | 2.00 | 9.50 | 1.50 | 11.25 |
| Rodriguez | 06/02/2011 | 6 | 0.00 | 9.00 | 1.00 | 7.50 |
| Rodriguez | | | | | Total Amount Owed | $58.13 |

The dates provided here are all the days derived from Defendant's Exhibits 12 and 13 demonstrating that Plaintiffs worked more than eight hours in single workday, but does not include those workdays where Plaintiffs also worked more than forty hours in a single workweek as Plaintiffs are already receiving overtime pay for those hours. Plaintiffs testified that they often worked more than eight hours in a single day, but Plaintiffs failed to identify specific dates where that occurred.

Although Defendant's Exhibits 12 and 13 provide data for only eleven weeks, the Court

extrapolates from this data that Defendant owes Plaintiffs unpaid overtime wages for the other weeks they worked for Defendant—after all, the FLSA requires Defendant to preserve records of the hours Plaintiffs worked *each day*, 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a). During the eleven-week period depicted in Defendant's Exhibits 12 and 13, Defendant owes Plaintiff Beccerril an average of $8.97 per week for violating the VIFWHA. During that same period, Defendant owes Plaintiff Rodriguez an average of $5.28 per week for violating the VIFWHA. Applying these rates to the weeks for which Defendant did not provide data, Defendant owes Plaintiff Beccerril an additional $538.20 for the hours that he worked in excess of an eight-hour day in violation of the VIFWHA, and Defendant owes Plaintiff Rodriguez an additional $89.76 for the same.[8] Accordingly, Defendant owes Plaintiff Beccerril a total of $636.83 and Plaintiff Rodriguez a total of $147.89 for violating the VIFWHA.

## III.    Defendant Did Not Wrongfully Discharge Plaintiffs

"[T]he plain language of [the VIWDA] unequivocally expresses the Legislature's intent to abolish the common-law employment-at-will doctrine by creating a presumption that any employment discharge is wrongful, stating that '[a]ny employee discharged for reasons other than those stated in subsection (a) of this section shall be considered to have been wrongfully discharged.'" *Pedro v. Ranger Am. of the V.I., Inc.*, 63 V.I. 511, 519 (2015) (quoting 24 V.I.C. § 76(c)). Although subsection (a) "provides that an employer can lawfully fire an employee for

---

[8] Plaintiff Beccerril worked for Defendant between January 22, 2010 and June 3, 2011, which is about seventy-one weeks. To determine the additional amount owed to Plaintiff Beccerril, the Court first subtracts the eleven weeks for which Defendant provided data and then multiplies the remaining weeks worked (60) by the weekly average owed for violating the VIFWHA ($8.97). Separately, Plaintiff Rodriguez worked for Defendant between November 20, 2010 and June 3, 2011, which is about twenty-eight weeks. To determine the additional amount owed to him, the Court performs the same calculation: subtract the eleven weeks for which Defendant provided data and multiply the remaining weeks worked (17) by the weekly average owed for violating the VIFWHA ($5.28).

one of nine enumerated reasons," *Maynard v. Rivera*, 675 F.3d 225, 228 (3d Cir. 2012), "a plaintiff need only allege that an employer discharged him," *Pedro*, 63 V.I. at 520. "It then becomes the employer's burden to plead any of the applicable grounds for a valid discharge set forth in [subsections] (a)–(c) as affirmative defenses." *Id.*; *see also Charles v. CBI Acquisitions, LLC*, 2018 V.I. LEXIS 89, at *5 (Super. Ct. Aug. 21, 2018) ("A plaintiff only bears the burden of pleading—and ultimately proving—that the plaintiff was discharged, and the permissible grounds for discharge set forth in sections 76(a)(1)-(9) and 76(c) are affirmative defenses that the defendant is required to plead and prove." (citing *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 543–44 (2015))).

At trial, this claim centered on whether Defendant terminated Plaintiffs "as a result of a general cutback in the work force due to economic hardship," as expressly permitted by subsection (c) of the VIWDA. As a result, Defendant carries the burden to "show some meaningful evidence of its financial condition" as "[m]ere assertions that business was slow, without more, do not constitute economic hardship." *Bellot v. Cardow, Inc.*, 2017 V.I. LEXIS 66, at *7 (Super. Ct. May 1, 2017).

Mr. Pede's testimony supports Defendant's affirmative defense that it terminated Plaintiffs because of economic hardship. Mr. Pede testified that Defendant was losing money in 2010 and 2011, which is supported by Defendant's Annual Report that was submitted to the Office of the Lieutenant Governor of the Virgin Islands pursuant to 13 V.I.C. § 1211 (*see* Def.'s Ex. 7). Defendant's Annual Reported depicts that Defendant had a "net income loss" of $1,695,639.00 in 2010 and a "net income loss" of $1,663,811.89 in 2011. (*Id.*) Other testimony corroborates this account. (*See* McCoy Dep. 24:12–14 (testifying how "[b]usiness was slow" and that Defendant simply "had too many employees"); Williams Dep. 32:3–8 (testifying that

"[f]inances were very scarce and . . . the management had made the decision to begin to reduce the workforce"); Adams Dep. 21:24–22:9 (testifying that "things [were] slow and they're going to do a little cutback" around the time that Plaintiffs were terminated); Bressi Dep. 42:22–23 (testifying that Defendant was losing money "hand over fist"). Mr. Pede also testified that terminating the dump truck drivers made sense because dump truck drivers were not working every day; other employees could perform the job of a dump truck driver while maintaining their own responsibilities. (*See* McCoy Dep. 23:23–24:6 ("I felt that the concrete drivers could serve dual purposes and drive the concrete trucks or the dump trucks, whereas the dump truck drivers could not drive . . . the concrete trucks.").) Moreover, the fact that Defendant closed its St. Thomas branch in December of 2013 and its St. Croix branch in November of 2014 buttresses Defendant's claim that it was struggling financially. *See Bellot*, 2017 V.I. LEXIS 66, at *8–9 (determining that defendant met its burden because defendant "operated at a significant financial loss," defendant discharged other employees, and defendant closed several of its locations). Plaintiffs' only proffered pieces of evidence to refute Defendant's showing of economic hardship are Plaintiff Beccerril's testimony that the work flow at the time was "very busy" and a photo of one of Defendant's employees driving a dump truck the day after the terminations. Plaintiffs fail to provide any documentation of Defendant's financial condition. Accordingly, Defendant did not terminate Plaintiffs in violation of the VIWDA.

## IV. Defendant Did Not Breach Implied Covenant of Good Faith and Fair Dealing

"[T]he implied duty of good faith and fair dealing arises by implication through the existence of a contract itself." *Chapman v. Cornwall*, 58 V.I. 431, 441 (2013); *see also* Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). A duty of good faith

prohibits each party from "act[ing] unreasonably in contravention of the other party's reasonable expectations. A successful claim ... requires proof of acts amounting to fraud or deceit on the part of the employer." *Chapman*, 58 V.I. at 441 (citing *Francis v. Pueblo Xtra Intern., Inc.*, 412 F. App'x 470, 475 (3d Cir. 2010); *Pennick v. V.I. Behavorial Serv.*, 2012 U.S. Dist. LEXIS 23402, at *7 (D.V.I. Feb. 22, 2012)).

Although Plaintiffs' position is unclear (*see generally* Pls.' Proposed Findings of Fact & Conclusions of Law at 1–20, ECF No. 176 (omitting any mention of breach of good faith and fair dealing claim)), the Court deduces that Plaintiffs' claim for breach of the implied covenant good faith and fair dealing hinges on whether Defendant terminated Plaintiffs for reasons other than the one stated—that Plaintiffs were terminated "[d]ue to economic difficulties" (Beccerril Termination Letter at 1; Rodriguez Termination Letter at 1). However, as stated above in the VIWDA discussion, Defendant was experiencing significant financial troubles at the time of Plaintiffs' terminations. Moreover, Plaintiffs present no other evidence even suggesting fraud, deceit, or bad faith. *Cf. Alvarezv Pueblo Int'l*, 24 V.I. 141, 146 (1989) (entering summary judgment in favor of defendant where "[plaintiff] has made no showing whatsoever of any fraud or deceit, or even of bad faith, on the part of the defendant"). Defendant's FLSA and VIFWHA violations do not change this conclusion: although Defendant's employment practices violated federal and territorial law, any other recovery predicated on the factual circumstances surrounding these violations would be duplicative of the damages already awarded. Accordingly, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails.

## CONCLUSION

For the foregoing reasons, judgment will be granted on behalf of Plaintiffs for Count I

(violation of the FLSA) and Count II (violation the VIFWHA); judgment will be granted on behalf of Defendant for Count III (violation of the VIWDA) and Count V (breach of implied covenant of good faith and fair dealing). The Court orders that $2,642.59 ($2,005.76 for the FLSA violation and $636.83 for the VIFWHA violation) be paid by Defendant to Plaintiff Beccerril and $1,210.36 ($1,062.47 for the FLSA violation and $147.89 for the VIFWHA violation) be paid by Defendant to Plaintiff Rodriguez. An appropriate order of judgment will follow, consistent with Rule 58 of the Federal Rules of Civil Procedure.

Date: Jan. 16, 2019

ANNE E. THOMPSON, U.S.D.J.